UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

SARA CARPENTER
and ROBERT CARPENTER,
individuals,

       Plaintiffs,

v.                           Civil Action No. 2:16-cv-4199

J.D. PERRY,
individually,
R.S. MINOR,
individually,
J.R. POWERS,
individually,
L.G. O'BRIAN,
individually,
S.W. PERDUE,
individually,
PAMELA INGRAM,
individually,
and JOHN DOES 1-5,
individually,

       Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>

       Pending is the Motion for Summary Judgment ("Motion"),

filed July 31, 2017, by J.D. Perry, R.S. Minor, J.R. Powers,

L.G. O'Brian,[1] and S.W. Perdue (collectively "defendants").[2]

---

[1] Defendants note that plaintiffs misspell L.G. O'Bryan's name as "O'Brian" in their Complaint. The court uses the name as spelled in the Complaint herein.

[2] Pamela Ingram was initially a named defendant in this case, but plaintiffs voluntarily dismissed Ms. Ingram on July 31, 2017, pursuant to F. R. Civ. P. 41. Dkt. 45

At the close of briefing, the only defendants in issue remaining in the action are J.D. Perry, R.S. Minor, and J.R. Powers; and the only Count of the four-count complaint remaining in issue is Count I alleging an unreasonable search and seizure by these three defendants of the plaintiff's home on May 13, 2014.

## I.  Factual Background

Plaintiffs Sara and Robert Carpenter are a married couple who, at the time of the events leading to this suit, resided at 172 Jarrett Heights Road in Elkview, West Virginia. Living with them was Ms. Carpenter's then sixteen-year-old[3] daughter, Lydia Jarrett, and the couple's then four-year-old son, P.C.[4]

On the night of May 1, 2014, Lydia ran away from home following an argument with her mother about spending time with her boyfriend after school.  Compl. ¶ 11; S. Carpenter Dep. at 88.  Ms. Carpenter contacted the West Virginia State Police ("State Police") to report her daughter as missing.  Compl. ¶

---

[3] Plaintiffs assert that Lydia was sixteen at the time of these events while defendants state that she was fifteen.  See Compl. ¶ 11; Defs' Mem. Mot. Summ. J. at 2, 4.

[4] Pursuant to L.R. Civ. P. 5.2.1(a)(2) P.C.'s initials are used because he was a minor child at the time of these events, and he still is.  Although Lydia was a minor child at the time of these events, she is now an adult.

12; Defs.' Mem. Mot. Summ. J. at 3; S. Carpenter Dep. at 115-16.
Trooper Stepp responded to Ms. Carpenter's report and located
Lydia at the home of her paternal grandfather, Chris Jarrett.
Compl. ¶ 12; Defs.' Mem. at 3; L. Jarrett Dep. at 8.  Trooper
Stepp returned Lydia to the Carpenters' home on May 2, 2014
around 3:00-4:00am.  S. Carpenter Dep. at 141.  Trooper Stepp
told Ms. Carpenter that Lydia had been picked up by the Elkview
Sheriff's department from the side of a road with a backpack.
S. Carpenter Dep. at 139.  Trooper Stepp later stated that Mr.
Jarrett had directed him to lie to Ms. Carpenter about where
Lydia was located.  Compl. ¶ 38; S. Carpenter Dep. at 139-40.
Later that same morning, Lydia went to school as usual, but Mr.
Jarrett removed her from school in the middle of the day without
notifying the Carpenters.  Compl. ¶ 15; Defs.' Mem. Mot. Summ.
J. at 3; S. Carpenter Dep. at 142.

     On the morning of May 2, 2014, Mr. Jarrett had filed a
Domestic Violence Petition ("DVP") in the Magistrate Court of
Kanawha County, and it had been granted on a temporary basis
with a hearing scheduled for May 14, 2014.  See Compl. ¶¶ 15-16.
As the basis for the DVP, Mr. Jarrett reported:

> [Sara Carpenter] has acted violently toward [Lydia
> Jarrett], destructive to the furnishing [sic]. [Sara
> Carpenter] is a heavy drinker uses illegal drugs as
> well as prescription drugs. Known drug dealer visits
> the residence frequently. Drugs are used and kept at
> the residence. [Lydia Jarrett] wants out of this
> environment and fears for herself as well as her 4
> year old stepbrother.

DVP at 6. He further reported to the court that when Trooper

Stepp took Lydia home on the morning of May 2, "the child did

not want to go back home and broke down in tears and was very

upset." Id. at Continuation Sheet. On May 6, 2014, Mr. Jarrett

filed a Petition for Appointment of Guardian. Defs.' Mem. Mot.

Summ. J. at 4.

On May 13, 2014, defendant Sergeant J.D. Perry, a

trooper with the State Police stationed at the Quincy

detachment, received information from his uncle, Mr. Jarrett,

regarding possible child neglect and endangerment, and drug use

and trafficking in the Carpenter home. Compl. ¶ 20; Written

Report of Trooper First Class Perdue, Ex. L Defs.' Mot. Summ. J.

at 1 ("Rep. Perdue"). Mr. Jarrett showed his nephew, Sergeant

Perry, several photos that he received from Lydia and her

boyfriend, A.J. Tignor, depicting apparent marijuana and

marijuana paraphernalia in the Carpenter home.[5] See Defs.' Mem.

---

[5] One photo contains an Easter basket, which defendants' suggest
means the photos were likely taken around Easter of 2014. The
court takes judicial notice that Easter took place on April 20
in 2014.

Mot. Summ. J. at 4-5; S. Carpenter Dep. at 22-38, 72, 82; Rep.
Perdue at 1.  One picture allegedly shows P.C. standing next to
a table upon which a bong sits.  Ex. 1 Defs.' Mot. Summ. J.  The
next two pictures purport to show Ms. Carpenter sitting at a
table and looking at and handling two mason jars filled with
possible marijuana.  Exs. 2-3 Defs.' Mot. Summ. J.  The fourth
picture is a closer shot of a mason jar filled with possible
marijuana next to what may be the same bong depicted in the
first photo.  Ex. 4 Defs.' Mot. Summ. J.  The next photo shows
Ms. Carpenter standing next to an overturned table.[6]  Ex. 5A
Defs.' Mot. Summ. J.  The remaining pictures allegedly show
various close up shots of cigarettes, marijuana pipes, jars
filled with marijuana, and bags filled with marijuana in the
Carpenter home.  Exs. 5B-5M Defs.' Mot. Summ. J.

Sergeant Perry was further informed that Mr. Carpenter
was a registered sex offender.  Compl. ¶ 21; Rep. Perdue at 1.
Mr. Carpenter pled guilty to charges of statutory rape for
having sex with a fifteen-year-old female sixty-six times when
he was thirty-six years old.  Defs.' Mem. Mot. Summ. J. at 7;
Compl. ¶ 22; R. Carpenter Dep. at 18.  At no time relevant to
this case was Mr. Carpenter on probation, parole, or supervised

---

[6] Lydia stated that her boyfriend, Mr. Tignor, told her that Ms.
Carpenter had flipped the table over while enraged and yelling.
L. Jarrett Dep at 32; Defs.' Mem. Mot. Summ. J. at 6.

release.  Compl. ¶ 28.  As a registered sex offender, Mr.
Carpenter must re-register yearly in the month of his birth with
the State Police detachment responsible for his county.  W. Va.
Code § 15-12-10; Compl. ¶¶ 22-23.  "All registrants . . . must
respond to all verification inquiries and informational requests
. . . . The State Police shall verify addresses . . . of
registered persons once a year."  W. Va. Code § 15-12-10.  Mr.
Carpenter's birthday is May 4th, and he had recently made his
yearly registration when Sergeant Perry learned of his status.
Compl. ¶ 22; Defs.' Mem. Mot. Summ. J. at 7.

        Sergeant Perry contacted Corporal Abbess of the South
Charleston detachment to inquire about the verification of Mr.
Carpenter's registration.  Compl. ¶ 21; Rep. Perdue at 1.
Corporal Abbess informed Sergeant Perry that Mr. Carpenter had
not yet been verified by the South Charleston detachment as of
May 13, 2014.  Compl. ¶ 24; Rep. Perdue at 1.

        Sergeant Perry then contacted Troopers Powers and
Minor and directed them to "conduct a verification of the
residence and offender registration to determine the validity of
[Mr. Carpenter's] registration information and any immediate
danger to the four year old child who remained in the
residence."  Rep. Perdue at 1; Compl. ¶ 26-27.  The Troopers
were instructed to "be mindful of any contraband that may be in

plain view." Written Report of Investigation or Inquiry

prepared by First Lieutenant LaFauci, Ex. A Pls.' Resp. Defs.'

Mot. Summ. J. at 10 ("Rep. LaFauci"). Both Powers and Minor were

shown the photos provided to Sergeant Perry by Mr. Jarrett.

Rep. Perdue at 1. Sergeant Perry further instructed Powers and

Minor to "only do a sex offender verification and if anything

further was located in the residence to secure the occupants and

obtain a search warrant." Rep. Perdue at 1; Compl. ¶ 27.

At 10:30pm on May 13, 2014, Troopers Powers and Minor

and two "ride-a-long subjects"[7] arrived at the Carpenter home at

172 Jarrett Heights Road. <u>See</u> Compl. ¶ 29; Rep. Perdue at 1; S.

Carpenter Dep. at 158-59, 163. Present in the home at that time

were Robert Carpenter; Sara Carpenter; Robert "Pierce"

Carpenter, Mr. Carpenter's adult son from a previous

relationship; Steven Carpenter, the Carpenters' nephew; and P.C.

S. Carpenter Dep. at 164-65, 173-74; Pls.' Resp. Mot. Summ. J.

at 5, 6 n.3. Pierce Carpenter answered the door and Troopers

---

[7] Plaintiff Sara Carpenter stated that the "ride-a-longs" were
represented to her as undercover, or plain-clothed officers. S.
Carpenter Dep. at 158-59 ("[t]here were two gentlemen in plain
clothes. They didn't give a name, but when I asked the troopers
who they were, they said they're undercovers, plainclothes
detectives."). These subjects were not actually police
detectives but civilian "ride-a-long subjects," Zachary May and
Daniel Muckel, who "completed the proper paperwork and were
approved." Rep. Perdue at 1; Rep. LaFauci at 11; S. Carpenter
Dep. at 163.

Powers and Minor asked him if he was Robert Carpenter.  Compl. ¶
30; Pls.' Resp. Mot. Summ. J. at 6.  Pierce answered
affirmatively,[8] and the officers grabbed him by the shoulder and
led him to the kitchen.  Compl. ¶ 30; Pls.' Resp. Mot. Summ. J.
at 6; S. Carpenter Dep. at 173.  Pierce Carpenter stated that
the State Police "shoved him against the wall and barged into
the residence," while Troopers Powers and Minor asserted that
they had been "invited . . . into the residence."  Rep. LaFauci
at 10.

　　　　Mr. Carpenter and P.C. were upstairs at the time
Troopers Powers and Minor and the two "ride-a-longs" entered the
Carpenter home. S. Carpenter Dep. at 160-62; R. Carpenter Dep.
at 25-26; Compl. ¶ 34.  The officers took both plaintiffs into
the kitchen along with Pierce and their nephew, Steven.  Compl.
¶ 32; S. Carpenter Dep. at 161-62.  Trooper Powers remained in
the kitchen with the Carpenters. S. Carpenter Dep. at 163; Rep.
Perdue at 1; Compl. ¶ 32.  P.C. was not brought into the
kitchen, and when Ms. Carpenter asked if she could get her

---

[8] Both Pierce and his father have the legal name of Robert
Carpenter.  Plaintiff Robert Carpenter goes by the name "Scott,"
and his son goes by the name "Pierce."  S. Carpenter Dep. at 161
("They said, 'Are you Robert Carpenter?" and he said, "Yes."
They grabbed him and shoved him through the hallway to my
kitchen, but my husband is also Robert Carpenter.  They assumed
that Pierce, which is what we call him, was Scott.  He was
not.").

unattended four-year-old son, the State Police refused.  S.

Carpenter Dep. at 162.  Ms. Carpenter states that upon asking to

retrieve her son the State Police told her that "if [she] didn't

sit down and shut up, they were going to cuff [her]."  S.

Carpenter Dep. at 162.

Ms. Carpenter asked the Troopers to show her a search

warrant, and both plaintiffs directly questioned why the

Troopers were there and what they were doing.  S. Carpenter Dep.

at 172; R. Carpenter Dep. at 27; Rep. Perdue at 1.  Neither

plaintiff ever consented to the Troopers' presence in or search

of their home.  Compl. ¶ 36; S. Carpenter Dep. at 237; R.

Carpenter Dep. at 52.  The parties differ in their accounts

about whether or not the plaintiffs were told the purpose of the

search.  Both plaintiffs state that the Troopers never told them

they were there to verify Mr. Carpenter's sex offender

registration.[9]

---

[9] Pls.' Resp. Defs.' Mot. Summ. J. at 6; R. Carpenter Dep. at 26-
28 ("Q: And what did the trooper say to you?  A: They said they
had a complaint.  They had heard that I had a white Cadillac
Escalade, is what Trooper Powers said, and they were coming to
verify and see if it was on my registry . . . . Q: Did they tell
you that they were there to verify your sex offender
registration?  A: No, they said they were checking that one
vehicle.  Q: Did you understand that they were there to verify
your sex offender registration?  A: Not at 10:30 at night, and
they don't ever come in the house, so no and no."); S. Carpenter
Dep. at 171 ("[T]hey didn't say why they were there.  When I
asked them they told me to go in the kitchen and sit down and

However, Sergeant Perry reported that when Ms. Carpenter told the Troopers they were not allowed in her home without a warrant, the Troopers told her "the purpose of the visit was to verify her husband Robert Scott Carpenter's information on the sex offender registry was correct and accurate." Rep. Perdue at 1. According to Sergeant Perry, Mr. Carpenter was also "advised of the reason for the visit." __Id.__ The State Police had made verifications of Mr. Carpenter's sex offender registration in the past, but on those occasions they had never come into the home. R. Carpenter Dep. at 27; S. Carpenter Dep. at 166-67. During previous verifications, the State Police would come to the house during the day or in the evening and ask Mr. or Ms. Carpenter to initial and sign a form verifying that Mr. Carpenter lives at that address, their internet service provider, cellular service provider, number and type of vehicles, and license plates. S. Carpenter Dep. at 166, 169-70.

While both plaintiffs were in the kitchen with Trooper Powers, Trooper Minor went upstairs. Compl. ¶ 32; R. Carpenter Dep. at 54; S. Carpenter Dep. at 162; Rep. LaFauci at 11. Ms. Carpenter asserts that the two "ride-a-long subjects" also went

---

shut up, or they were going to cuff me and take me to jail. They never said they were there to verify his sex offender registry.").

upstairs.  S. Carpenter Dep. at 162.  Sergeant Perry, who was
not present, reported that the "ride-a-long participants stayed
in the entry area of the residence while the verification was
conducted and had no interaction with the residence occupants."
Rep. Perdue at 1.  One "ride-a-long," Mr. May, stated they
remained in the entry way of the home, while the other, Mr.
Muckel, said that they remained outside during the incident.
Rep. LaFauci at 11.

        Trooper Minor conducted a search of the home including
"opening doors [and] looking through things" on the first floor,
and going upstairs.  S. Carpenter Dep. at 162; Pls.' Resp.
Defs.' Mot. Summ. J. at 8.  Mr. Carpenter asked the Troopers
what they were doing and they responded that "they were looking
for hidden cell phones and computers." R. Carpenter Dep. at 27.
As part of the internal investigation of the Troopers' conduct,
Trooper Minor stated that he went upstairs "to conduct a 'sweep'
to ensure no other persons were located in the residence . . . .
and he made a 'walk through' for officer safety purposes."  Rep.
LaFauci at 11.  After the Troopers left, Ms. Carpenter found
that dresser drawers had been left open and the contents had
been disturbed.  Id.

        At no time did Troopers Powers or Minor ask to see
either plaintiffs' cell phone.  Pls.' Resp. Defs.' Mot. Summ. J.

11

at 7; R. Carpenter Dep. at 53; S. Carpenter Dep. at 237.  At no
time did Troopers Powers or Minor go into the plaintiffs'
garage.  Pls.' Resp. Defs.' Mot. Summ. J. at 7; R. Carpenter
Dep. at 53.  At no time did Troopers Powers or Minor show
plaintiffs a verification form for initial and signature as the
State Police had done in the past when verifying Mr. Carpenter's
sex offender registration.  Pls.' Resp. Defs.' Mot. Summ. J. at
8-9; S. Carpenter Dep. 242-43.  After thirty minutes to over an
hour, the Troopers and both "ride-a-long subjects" left the
residence.  Compl. ¶ 35; S. Carpenter Dep. at 168; R. Carpenter
Dep at 28.  This was the only verification where the State
Police entered the plaintiffs' home and the only verification
where they did not provide the Carpenters with a verification
form.  R. Carpenter Dep. at 26-28; S. Carpenter Dep. at 242-43;
Pls.' Resp. Defs.' Mot. Summ. J. at 9.

     The next day, May 14, 2014, the Carpenters appeared at
Kanawha County Family Court for the hearing on Mr. Jarrett's DVP
on behalf of his granddaughter, Lydia.  Compl. ¶ 8; Family Court
Order Denying Domestic Violence Protective Order and Terminating
the Emergency Protective Order ("Order"), Ex. I Defs.' Mot.
Summ. J.  At the hearing, Judge Mike Kelly denied Mr. Jarrett's
DVP for failure to prove the allegations.  Order at 1.  Trooper
Stepp testified at this hearing that Mr. Jarrett had asked him

to lie to plaintiffs about where Lydia was located on the night she ran away to her grandfather's home.  Compl. ¶ 38; see Order at 1; S. Carpenter Dep. 139-40.

Also on May 14, 2014, Sergeant Perry consulted with Sergeant O'Brian about the photographs turned over to him by Mr. Jarrett.  Rep. Perdue at 1.  Sergeant O'Brian consulted with Kanawha County special prosecutor, Amy Bird, and opened up a further investigation due to "the quantity of substances being stored and trafficked at the residence." Id.  Trooper Perdue was assigned as the investigating officer.  Id.  Trooper Perdue interviewed Lydia who told him, among other things, that her mother used marijuana openly in front of her and P.C., drank beer and wine heavily, drove intoxicated, had large parties where drugs were present, offered marijuana to her, smoked marijuana with her, sold marijuana, and yells at and hits P.C. Defs.' Mem. Mot. Summ. J. at 9-12; Statement of Lydia Jarrett, Ex. K Defs.' Mot. Summ. J.  Trooper Perdue contacted Child Protective Services, who assigned West Virginia Department of Health and Human Resources case worker Pamela Ingram.  Defs.' Mem. Mot. Summ. J. at 12.  Ms. Ingram also interviewed Lydia and was told similar accusations against Ms. Carpenter.  Id.; W. Va. Child Protective Servs. Sys. Family Functioning Assessment, Ex. O Defs.' Mot. Summ. J. at 5.

13

On May 30, 2014, based on the allegations of Mr. Jarrett and Lydia, the photos given to State Police, and the report of Ms. Ingram, Kanawha County Magistrate Kim Aaron issued search warrants for the plaintiffs' home at 172 Jarrett Heights Road, and the adjoining property owned by Mr. Carpenter at 174 Jarrett Heights Road. Defs.' Mem. Mot. Summ. J. at 13; Rep. Perdue at 2. Finding probable cause that plaintiffs had committed child endangerment[10] and possession with the intent to deliver a controlled substance,[11] Magistrate Aaron also issued warrants for plaintiffs' arrest that same day. Defs.' Mem. Mot. Summ. J. at 14.

Troopers Perdue and Minor, with other unknown troopers, executed the search warrants on both the 172 and 174 Jarrett Heights Road properties. Exs. M-N Defs.' Mot. Summ. J.; Defs.' Mem. Mot. Summ. J. at 14; see Compl. ¶¶ 39-43. No drugs or drug paraphernalia were located at either property. Defs.' Mem. Mot. Summ. J. at 14; Compl. ¶ 40; Rep. Perdue at 2. Pursuant to the arrest warrant for child endangerment and possession with the intent to deliver a controlled substance, the Troopers arrested Ms. Carpenter, who was held for several hours in jail before being released, and against whom the

---

[10] W. Va. Code § 61-8D-4.
[11] W. Va. Code § 60A-4-401.

charges were ultimately dismissed for lack of evidence.  Compl.
¶ 40, 44, 46; Defs.' Mem. Mot. Summ. J. at 14; Rep. Perdue at 2.
Mr. Jarrett had separately filed a Petition for Appointment of
Guardian in Kanawha County Family Court, but the Guardian ad
litem appointed to investigate found nothing that would make the
Carpenter home unsuitable for children.  Compl. ¶ 47.

## II.  Procedural History

Plaintiffs generally allege that Mr. Jarrett used his
familial relationship with his nephew, Sergeant Perry, to
instigate the actions of the State Police that led to this case.

On May 5, 2016, plaintiffs filed their complaint in
this court pursuant to 42 U.S.C. § 1983 for the commission of an
unreasonable search and seizure of their home (Count I) in
violation of the Fourth Amendment to the United States
Constitution.[12]  Compl. at 1.

As earlier noted, the only remaining issue for
resolution is Count I as asserted against defendants Perry,
Minor, and Powers for the "warrantless search of plaintiffs'

---

[12] Plaintiffs do not contest the dismissal of all claims against
defendants Perdue, O'Brien, and Doe.  Pls. Resp. Defs.' Mot.
Summ. J. at 18-19.  Ingram was earlier dismissed by stipulation.
Plaintiffs also do not contest the dismissal of the remaining
Counts, II, III, and IV.  Id.

residence, 172 Jarrett Heights Road, on May 13, 2014, beginning around 10:30pm." Id. at 2.

Defendants assert that they are entitled to judgment as a matter of law because the entry of Troopers Powers and Minor into the Carpenter residence was protected by qualified immunity and was not unreasonable under the Fourth Amendment. Defs.' Mem. Mot. Summ. J. at 18. The defendants add that the fact that the "verification was conducted without a warrant, consent, or exigent circumstances is irrelevant because those three bases for a search do not occupy the field of Fourth Amendment reasonableness." Id. They contend that the search was reasonable because of the special needs associated with monitoring sex offenders. Id. at 18-20.

Plaintiffs respond that the verification allegedly conducted by the State Police at 10:30pm on May 13, 2014 was an unreasonable search under the Fourth Amendment that meets no applicable exception. Pls.' Resp. Defs.' Mot. Summ. J. at 2-3. Plaintiffs further reiterate their view that the verification was a pretextual Trojan Horse that allowed State Police entry to the Carpenter Home to search for drugs and child neglect to be used as evidence at the Family Court hearing that was scheduled to take place the next morning. See Id. at 2-3, 16. The

response also asserts that defendants are not entitled to qualified immunity for their actions.  Id. at 16.

### III.  Governing Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (same).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, 477 U.S. at 248.

The moving party has the initial burden of showing — "that is, pointing out to the district court — that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party satisfies this burden, then the non-moving party must set forth specific facts, admissible in evidence, that

demonstrate the existence of a genuine issue of material fact for trial.  <u>See</u> <u>id.</u> at 322-23; Fed. R. Civ. P. 56(c), (e).

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find for the non-moving party.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson v. Liberty Lobby</u>, 477 U.S. at 248.

## IV.  <u>Discussion</u>

### A.  <u>The Fourth Amendment to the United States Constitution</u>

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. Amend. IV.

###     i.     Search

A search occurs when a government actor "physically occupie[s] private property for the purpose of obtaining information." U.S. v. Jones, 565 U.S. 400, 404 (2012). In Jones, the Court held that affixing a GPS tracking device to a target's vehicle to monitor the vehicle's movements constituted a search under the Fourth Amendment. Id. Because the government temporarily trespassed when it affixed the GPS tracker onto Jones' car, they performed a search in their gathering of information recorded by the tracker.

Here, defendants accept, arguendo, that the entry of plaintiffs' home on May 13, 2014 was a search for Fourth Amendment purposes. Defs.' Reply Pls.' Resp. n.1. Indeed, the facts in this case support such a finding. Defendants Powers and Minor entered the Carpenter home to collect information. Whether that information was collected for the verification of Mr. Carpenter's sex offender registration or for an impending Family Court proceeding, the actions of the defendants fall plainly within the scope of a Fourth Amendment search.

## ii.   Reasonableness

The Fourth Amendment does not prohibit all searches, rather it protects individuals from those that are unreasonable. Carroll v. U.S., 267 U.S. 132, 147 (1925).  "Because an individual's expectation of privacy is 'at [its] apex in one's home,' warrantless searches of homes are unconstitutional under the Fourth Amendment absent some type of justification."  Yanez-Marquez v. Lynch, 789 F.3d 434, 464 (4th Cir. 2015) (citing U.S. v. Gray, 491 F.3d 138, 146 (4th Cir. 2007); Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).  "[N]ot just any claimed justification will suffice to excuse a warrantless home entry, for the right of a man to retreat into his own home and there be free from unreasonable government intrusion is at the very core of the Fourth Amendment."  U. S. v. Taylor, 624 F.3d 626, 631 (4th Cir. 2010) (citations omitted).  "When it comes to the Fourth Amendment, the home is first among equals," and is guarded with a special jealousy that warrants the greatest protection.  Florida v. Jardines, 569 U.S. 1, 6 (2013); see also Yanez-Marquez, 789 F.3d at 464.

The exceptions to the notion that warrantless searches of a person's home are per se unreasonable are "narrow and well-delineated in order to retain their constitutional character."  Flippo v. West Virginia, 528 U.S. 11, 13 (1999) (per curiam)

(citing Katz v. United States, 389 U.S. 347, 357 (1967)).

Justifications for a warrantless search include: exigent

circumstances, Brigham City, 547 U.S. at 403-04, voluntary

consent, Schneckloth v. Bustamonte, 412 U.S. 740, 748 (1984),

and special needs of the government, Skinner v. Railway Labor

Executives' Ass'n, 489 U.S. 602, 620 (1989).

       "Search regimes where no warrant is ever required may

be reasonable where special needs . . . make the warrant and

probable-cause requirement impracticable, and where the primary

purpose of the searches is distinguishable from the general

interest in crime control . . . ." City of Los Angeles v.

Patel, 135 S.Ct. 2443, 2452 (2015).  However, if the primary

purpose of a regime "is to uncover evidence of ordinary

wrongdoing," or "is ultimately indistinguishable from the

general interest in crime control," a special needs exception

does not exist.  City of Indianapolis v. Edmond, 531 U.S. 32,

42-44 (2000). Where a law enforcement purpose exists, or where

there is extensive law enforcement involvement, the search does

not "fit within the closely guarded category of constitutionally

permissible suspicionless searches" and there can be no

permissible special need.  Chandler v. Miller, 520 U.S. 305, 309

(1997); Ferguson v. City of Charleston, 532 U.S. 67, 82-84

(2001).  If a special need does exist, the court "balance[s] the

governmental and privacy interests to assess the practicality of
the warrant and probable-cause requirements in the particular
context." <u>Skinner</u>, 489 U.S. at 619.

In this case, the warrantless search regime at issue
is the verification of sex offender registrations.[13]  Pursuant to

---

[13] W. Va. Code § 15-12-2(d) describes the registration
requirements that underlay the verification procedures at issue
in this case.  It requires that registering sex offenders must
do so yearly, in person, with the State Police detachment
responsible for the county of residence.  As part of this
registration, the registrant must, at minimum, provide the
following information to the State Police:

> (1)  The full name of the registrant, including
> any aliases, nicknames or other names used by
> the registrant;
>
> (2)  The address where the registrant intends
> to reside or resides at the time of
> registration, the address of any habitable real
> property owned or leased by the registrant that
> he or she regularly visits . . . the name and
> address of the registrant's employer or place
> of occupation at the time of registration, the
> names and addresses of any anticipated future
> employers or places of occupation, the name and
> address of any school or training facility the
> registrant is attending at the time of
> registration and the names and addresses of any
> schools or training facilities the registrant
> expects to attend;
>
> (3)  The registrant's Social Security number;
>
> (4)  A full-face photograph of the registrant
> at the time of registration;
>
> (5)  A brief description of the crime or crimes
> for which the registrant was convicted;

W. Va. Code § 15-12-10, sex offenders required to register "must
respond to all verification inquiries and informational
requests, including, but not limited to, requests for online
information made by the State Police pursuant to this section.
The State Police shall verify addresses of . . . registered
persons once a year."  "Online information" is defined in W. Va.
Code § 15-12-2(d)(8) as "information relating to any Internet
accounts the registrant has and the screen names, user names or
aliases the registrant uses on the internet."  The verification

_____

> (6)   Fingerprints and palm prints;
>
> (7)   Information related to any motor vehicle,
> trailer or motor home owned or regularly
> operated by a registrant, including vehicle
> make, model, color and license plate number . .
> . ;
>
> (8)   Information relating to any Internet
> accounts the registrant has and the screen
> names, user names or aliases the registrant
> uses on the Internet; and
>
> (9)   Information related to any telephone or
> electronic paging device numbers that the
> registrant has or uses, including, but not
> limited to, residential, work and mobile
> telephone numbers.

Additionally, under W. Va. Code § 15-12-8, a registrant who
"knowingly provides materially false information or who refuses
to provide accurate information . . . or knowingly fails to
register or knowingly fails to provide a change in any required
information" may be punished with either a misdemeanor or felony
resulting in imprisonment. Id. at § 15-12-8(a)-(c).

procedures to be followed by the State Police are outlined in W. Va. Code. R. § 81-14-13.3, which states in relevant part:

> 13.3.g. Within fifteen (15) working days of the date of registration a uniformed member of the West Virginia State Police shall make an appearance at the person's residence to verify that the person resides at or has moved from the given address, and; shall contact the Post Office to verify that person receives mail or no longer receives mail at the given address and document date verified on detachment copy.

Furthermore, registrants "shall cooperate fully with the State Police uniformed member when he/she physically arrives at the person's address to verify that the given address is correct." W. Va. Code R. § 81-14-17.5.a.1. "Persons required to register must comply with all verification inquiries or requests made by the State Police." W. Va. Code R. § 81-14-17.5.e.

This procedure is generally consistent with the previous verifications of Mr. Carpenter's registration recounted by plaintiffs. Save for the events of May 13, 2014, the State Police would visit the Carpenter residence and have Mr. or Ms. Carpenter initial and sign a form verifying that the information provided during registration was correct. S. Carpenter Dep. at 166, 169-70. State Police had never entered the home on any previous occasion. R. Carpenter Dep. at 26-28; S. Carpenter Dep. at 167; Pls.' Resp. Defs.' Mot. Summ. J. at 9. Nevertheless, defendants assert that the May 13, 2014

verification was a reasonable search under the Fourth Amendment based on the special needs of dealing with sex offenders as authorized by the statute.  Defs.' Mem. Mot. Summ. J. at 18-20.

West Virginia's Sex Offender Registration Act ("Act") was intended to "assist law-enforcement agencies' efforts to protect the public from sex offenders by requiring sex offenders to register with the State Police detachment in the county where he or she shall reside and by making certain information about sex offenders available to the public . . . ."  W. Va. Code §§ 15-12-1, 15-12-1a(a).  Because there is a "compelling and necessary public interest that the public have information concerning persons convicted of sexual offenses," the legislature stated that "persons required to register as sex offenders pursuant to this article have a reduced expectation of privacy because of the State's interest in public safety."  W. Va. Code § 15-12-1a(b), (c).

The West Virginia State Supreme Court has upheld provisions of the Act against a series of challenges under both the United States and West Virginia Constitutions.  See, e.g., In re Jimmy M.W., No. 13-0762, 2014 W. Va. LEXIS 586, at *4 (W. Va. May 30, 2014) (cataloging cases rejecting attacks based on ex post facto, procedural due process, separation of powers, and punitive nature of the Act).  Similarly, district courts of this

circuit have denied challenges to the constitutionality of the
Act based on the Due Process, Equal Protection, and Ex Post
Facto clauses.[14]  However, there appear to be no cases that
address the constitutionality of the State Police entering the
home to conduct a verification of information as required by W.
Va. Code § 15-12-10.

     "Sex offenders are a serious threat in this Nation,"
and "[s]tates have a vital interest in rehabilitating convicted
sex offenders."  McKune v. Lile, 536 U.S. 24, 32-33 (2002).
States have enacted statutes that allow the monitoring of sex
offenders in a variety of ways that do not violate the Fourth
Amendment including: tracking sex offenders by GPS trackers, in
some cases for life, Belleau v. Wall, 811 F.3d 929 (7th Cir.
2016); collecting and recording the DNA of incarcerated sex
offenders, Roe v. Marcotte, 193 F.3d 72 (2d Cir. 1999), or of
any sex offender, People v. Wealer, 636 N.E.2d 1129 (Ill. App.
Ct. 1994); and requiring sex offenders in prison to undergo
testing "to identify sexual deviant cycles," Pool v. McKune, 987

---

[14] Wiley v. W. Va. House of Delegates, No. 2:14-cv-10974, 2017
U.S. Dist. LEXIS 22939, at *16-22 (S.D.W.V., Jan. 30, 2017)
(Tinsley, Mag. J.), adopted by Wiley v. W. Va. House of
Delegates, No. 2:14-cv-10974, 2017 U.S. Dist. LEXIS 22757
(S.D.W.V., Feb. 17 2017) (Johnston, J.); Cunningham v. Lemmon,
No. 6:06-cv-00169, 2007 U.S. Dist. LEXIS 97020, at *14-38
(S.D.W.V., Feb. 14, 2007) (Stanley, Mag. J.), adopted by
Cunningham v. Lemmon, No. 6:06-cv-00169, 2007 U.S. Dist. LEXIS
20587 (S.D.W.V., Mar. 22, 2007) (Goodwin, J.).

P.2d 1073, 1076 (Kan. 1999). However, these cases are distinguishable from this one either because the individuals being monitored were incarcerated or because of the search's minimal infringement into the privacy rights of the sex offender.

Defendants rely primarily on Belleau to support their claim that West Virginia has a special need to make entry into the homes of sex offenders for verifications even when the offenders are "no longer subject to formal state-imposed liberty restriction[s]." Defs' Mem. Mot. Summ. J. at 23. In Belleau the Seventh Circuit Court of Appeals upheld Wisconsin's lifetime GPS monitoring program for a sex offender, who was not on bail, parole, probation, or supervised release. 811 F.3d at 932, 937. The court found that "[s]uch [GPS] monitoring of sex offenders is permissible if it satisfies the reasonableness test applied in special-needs cases," Id. at 937, and ultimately concluded that "the monitoring scheme constitutes a reasonable special needs search," Id. at 939 (Flaum, J. concurring). The government's need to reduce recidivism and collect information on the whereabouts of sex offenders outweighed the privacy concerns of the individual sex offender. Id. at 940 (Flaum, J. concurring).

The court's reasoning was based on: (1) the nature of "serious child sex offenses,"[15] particularly the rate at which offenders reoffend and the "lifelong psychological scars" that these crimes "frequently inflict," and (2) on the incremental intrusion of the challenged statute on an offender's privacy. Id. at 933-35; Wis. Stat. § 301.48. This case is distinguishable as to the type of search at issue. The court in Belleau acknowledged that "[t]he 'search' conducted in this case via the [GPS] anklet monitor is less intrusive than a conventional search." 811 F.3d at 937. "For it's not as if the Department of Corrections were following the [offender] around [and] peeking through his bedroom window . . . . The fruits of such surveillance techniques would be infringements of privacy that the Supreme Court deems serious." Id. at 935. The privacy loss to a sex offender when "occasionally his trouser leg hitches up and reveals an anklet monitor that may cause someone who spots it to guess that this is a person who has committed a sex crime must be slight." Id. This stands in stark contrast to the warrantless entry of State Police into the Carpenter

_____

[15] The statute at issue in Belleau was applicable only to sex offenders who had committed "level 1" or "level 2" sex offenses. See Wis. Stat. § 301.48. These offenses are either committed against children under the age of twelve, children under the age of thirteen where "great bodily harm" results, or "by use or threat of force or violence" against a child under sixteen years of age. Id. at (1)(cm)-(cn).

home, which falls much closer to the "conventional search" mentioned in <u>Belleau</u>, and sits at the heart of the Fourth Amendment protections. <u>See</u> <u>Taylor</u>, 624 F.3d at 631.

Similarly, the collection and recording of sex offender DNA is a minimal intrusion into the privacy of the offenders. In <u>People v. Wealer</u>, the court found that "[t]he physical intrusion imposed by the [DNA] testing . . . is relatively slight . . . [and] the privacy interest that a convicted sex offender has in his or her identity is minimal." 636 N.E.2d at 1136. Contrastingly, because an individual's expectation of privacy is "at [its] apex in one's home," <u>Wealer</u> is distinguishable from the present case. <u>U.S. v. Gray</u>, 491 F.3d 138, 146 (4th Cir. 2007).

The West Virginia statute authorizing in person verifications and the verification procedures in the accompanying regulation do not purport to direct the entry of State Police into the home in order to complete the verification. <u>See</u> W. Va. Code § 15-12-10; W. Va. Code R. § 81-14-13.3. It is well established that police officers without a warrant may permissibly approach a home, knock, and seek consent to enter. <u>Jardines</u> 569 U.S. at 8; <u>U.S. v. Moore</u>, No. 5:14-cr-56, 2015 U.S. Dist. LEXIS 2179, at (W.D.N.C. Jan. 7, 2015) (upholding a search of a home after getting valid consent as

part of a "sex offender compliance check").  When sex offenders
are on some form of supervised release, officers may enter the
home pursuant to the provisions of that release.  State v.
Bogart, 2013 109 A.3d 883, 892 (Vt. 2014); Doe v. Prosecutor,
566 F.Supp.2d 862, 884-85 (S.D. Ind. 2008); see also U.S. v.
Knights, 534 U.S. 112, 118 (2001) ("[A] court granting probation
may impose reasonable conditions that deprive the offender of
some freedoms enjoyed by law-abiding citizens.").

        By contrast, it is held impermissible for an officer
to search the home of a sex offender who is not on parole or
under supervision without a warrant or consent to do so.  Doe v.
Nebraska, 734 F.Supp.2d 882, 900-01 (D. Neb. 2010) (finding that
a Nebraska law requiring sex offenders who were not on parole,
probation, or supervision to consent to a search of their homes
and computers "clearly violates the Fourth Amendment"); Doe v.
Prosecutor, 566 F.Supp.2d at 878, 883-85 (declining to extend
the special needs doctrine to allow law enforcement to search
devices with internet capability at any time for persons
registered as sex offenders who were not under any form of
supervision).

        Both Doe v. Nebraska and Doe v. Prosecutor concerned
statutes that required registering sex offenders who were not on
parole, probation, or other supervised release to consent to a

search of their homes and computers.[16] <u>Nebraska</u> 734 F.Supp.2d at 896; <u>Prosecutor</u> 566 F.Supp.2d at 867.  In both cases, the courts found that forcing registrants to consent to searches of their personal computers was in violation of the Fourth Amendment. <u>Prosecutor</u> 566 F.Supp.2d at 878 ("By granting unlimited access to these devices, the Indiana legislation crosses the most fundamental boundary under the Fourth Amendment."); <u>Nebraska</u> 734 F.Supp.2d at 900-01.  Though the West Virginia Act in this case does not require registrants to sign a form of consent allowing

---

[16] In <u>Nebraska</u>, the statute at issue provided that:

> [T]he registrant shall sign a consent form . . . authorizing the: (a) Search of all the computers or electronic communication devices possessed by the person; and (b) Installation of hardware or software to monitor the person's Internet usage on all the computers or electronic communication devices possessed by the person.

Neb. Rev. Stat. § 29-4006(2) (2010).  Similarly, in <u>Prosecutor</u>, the statute required that:

> [T]he offender shall sign a consent form authorizing the: (1) search of the sex or violent offender's personal computer or device with Internet capability at any time; and (2) installation on the sex or violent offender's personal computer or device with Internet capability, at the sex offender's expense, of hardware or software to monitor the sex or violent offender's Internet usage.

Ind. Code § 11-8-8-8(b) (2008).  While neither statute explicitly allowed entry into a registrant's home, "personal computers will most often be inside the home."  <u>Prosecutor</u> 566 F.Supp.2d at 878.

State Police to access their homes, interpreting the Act to allow warrantless entry into homes for the purposes of verifying registration information is equally troubling under the Fourth Amendment.

The privacy right of plaintiffs to be secure in their own home is at the core of the Fourth Amendment, and though the government certainly has an interest in protecting the public from sex offenders by collecting and releasing public information about those offenders this does not allow for warrantless entry into private residences.  Therefore, the entry of State Police into the Carpenter home for the purpose of performing a sex offender registration verification of one not under supervision is an unreasonable search under the Fourth Amendment and does not meet a valid special needs exception.

## B.  Qualified Immunity

Although a search made for the purposes of a sex offender verification is unreasonable under the Fourth Amendment, plaintiffs' claim brought under 42 U.S.C. § 1983 must overcome the defense of qualified immunity asserted by the defendants.  It is well established that government officials are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." **Harlow v. Fitzgerald**, 457 U.S. 800, 818 (1982).
Qualified immunity provides police officers with "'ample room
for mistaken judgments' by protecting 'all but the plainly
incompetent or those who knowingly violate the law.'" **Hunter v.
Bryant**, 502 U.S. 224, 229 (1991) (quoting **Malley v. Briggs**, 475
U.S. 335, 341 (1986)).  Officers "are not liable for bad guesses
in gray areas," but "they are liable for transgressing bright
lines." **Maciarello v. Sumner**, 973 F.2d 295, 298 (4th Cir.
1992).

        In determining whether an officer is entitled to
qualified immunity the court "asks first whether a
constitutional violation occurred and second whether the right
violated was clearly established. **Melgar v. Greene**, 593 F.3d
348, 353 (4th Cir. 2010) (citing **Pearson v. Callahan**, 555 U.S.
223, 241 (2009); **Saucier v. Katz**, 533 U.S. 194 (2001)). As
previously discussed, the Carpenters' Fourth Amendment rights
were violated by the unreasonable search conducted in their home
on May 13, 2014.  The only remaining inquiry is whether the
right was "clearly established."

        For a right to be "clearly established," it is not
necessary that "the very act in question have been previously
held unlawful," but "in the light of pre-existing law the
unlawfulness must be apparent." **Anderson v. Creighton**, 483 U.S.

635, 640 (1987). "[I]f the contours of the right are sufficiently clear so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right" there is no entitlement to qualified immunity. Bailey v. Kennedy, 349 F.3d 731, 741 (4th Cir. 2003) (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)).

Defendants are not entitled to qualified immunity for the warrantless search of the Carpenter home on May 13, 2014. "The State Police shall verify addresses of . . . all other registered persons once a year." W. Va. Code § 15-12-10. W. Va. Code R. § 81-14-13.3 gives guidance to the State Police on how to conduct the required verification, directing that "Within fifteen (15) working days of the date of registration a uniformed member of the West Virginia State Police shall make an appearance at the person's residence to verify the person resides at or has moved from the given address . . . ." Id. at §81-14-13.3.g. Registrants must "cooperate fully with the State Police" when they conduct a verification and "must comply with all verification inquiries or requests made by the State Police." Id. at § 81-14-17.5. Inquiries may include requests for "[i]nformation relating to any Internet accounts the registrant has and the screen names, user names or aliases the

registrant uses on the Internet." W. Va. Code § 15-12-2(d)(8);
<u>see</u> W. Va. Code § 15-12-10.

Nothing in the statutes or rules would give a
reasonable officer reason to believe that he or she may enter
and search the home of a registered sex offender without a
warrant, consent, exigent circumstances or any other applicable
exception to the Fourth Amendment. The rules merely direct a
uniformed State Police Trooper to ensure that the registrant
lives at the reported address by "mak[ing] an appearance" at the
reported residence. W. Va. Code R. § 81-14-13.3.g. An officer
may always permissibly approach a home, knock, and seek consent
to enter. <u>Jardines</u> 569 U.S. at 8. However, entry into the home
absent that consent, warrant, or other exception is the concern
at the very heart of the Fourth Amendment, and nothing in the
statutes or rules gives any indication that the State Police
may, without more, enter a registrant's home to conduct a search
as part of the verification. At best, the State Police may make
informational inquiries of the registrant, but nothing indicates
that these inquiries may take the form of a search of the
registrant's private residence. <u>See</u> W. Va. Code § 15-12-10.
This is further supported by the fact that the State Police
never entered the Carpenter home as part of the verification at

any time other than on May 13, 2014.  R. Carpenter Dep. at 27;
S. Carpenter Dep. at 166-67.

Absent consent (which is but one of several sharply
disputed questions of material fact in this case) defendants
Perry, Powers, and Minor violated the clearly established rights
of the plaintiffs, and no reasonable officer would have believed
this conduct was permissible.  Accordingly, they are not shown
at this juncture to be entitled to qualified immunity.

## V.  <u>Conclusion</u>

For the foregoing reasons, it is ORDERED that
defendants' motion for summary judgment be, and it hereby is,
denied.

Pursuant to the plaintiffs' acknowledgements in their
briefing accompanying this motion, it is further ORDERED that
Counts II, III, and IV and defendants L.G. O'Brian, S.W. Perdue,
and John Does 1-5 be dismissed from this action.

The Clerk is requested to transmit copies of this
order to all counsel of record and any unrepresented parties.

Dated: November 21, 2017

John T. Copenhaver, Jr.
United States District Judge