UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

SARA CARPENTER and
ROBERT CARPENTER, individuals,

     Plaintiffs,

v.                    Civil Action No. 2:16-cv-4199

J.D. PERRY, individually, and
R.S. MINOR, individually, and
J.R. POWERS, individually,

     Defendants.


MEMORANDUM OPINION AND ORDER


     Pending is plaintiffs' renewed motion for judgment as a matter of law, or in the alternative, motion for a new trial, filed December 13, 2017.  Pls.' Mot., ECF No. 84.


I. Background


     On December 5 through 7, 2017, this case was tried by a jury resulting in a verdict in favor of the defendants and against the plaintiffs.  The governing issue in the case is whether there was an unreasonable search and seizure of plaintiffs' home by members of the West Virginia State Police in

violation of the Fourth Amendment of the United States Constitution through 42 U.S.C. § 1983.  The jury returned the verdict as follows, in pertinent part:

> 1. We, the jury find by a preponderance of the evidence that a Defendant, or Defendants, violated Sara and Robert Carpenter's Fourth Amendment right to be free from an unreasonable search and seizure of their home.
>
> _____    Yes
>
> __X__    No

Jury Verdict, ECF No. 81.

This suit arose from the entry of the defendant officers into the home of Robert Scott Carpenter and Sara Carpenter on May 13, 2014 in order to conduct an annual sex offender verification with respect to Robert Scott Carpenter pursuant to W. Va. Code § 15-12-10, of certain information prescribed by statute, such as cell phones, autos, and internet accounts and user names.  See W. Va. Code § 15-12-2(d).  It is undisputed that the defendant officers did not have a warrant to enter the Carpenter home.  Prior to trial, the court had denied defendants' motion for summary judgment, finding that the officers' entry for the purposes of a sex offender verification was not justified under the special needs exception to the Fourth Amendment.  Mem. Op. Order, ECF No. 61 at 32.

Furthermore, the defendant officers were not entitled to qualified immunity, as "[n]othing in the statutes or rules would give a reasonable officer reason to believe that he or she may enter and search the home of a registered sex offender without a warrant, consent, exigent circumstances, or any other applicable exception to the Fourth Amendment." Id. at 35.

On December 4, 2017, the eve of trial, defendants proposed a supplemental jury instruction on the issue of consent. See ECF No. 69. Plaintiffs made no objection to its timeliness either at or before trial, but instead assented to and supplied input on the language of the instruction.

At the close of the evidence, plaintiffs moved for judgment as a matter of law pursuant to Rule 50(a)(1) of the Federal Rules of Civil Procedure. The court did not grant this motion, and instead submitted the case to the jury. The court gave the jury the following instruction on the issue of consent, without objection:

> A police officer may, without violating the
> Fourth Amendment, enter and search a residence
> without a warrant (or any other justification) if
> he has been given consent by someone with the
> authority to grant such consent. People who live
> at the residence have the authority to grant such
> consent, as does any other person who possesses
> common authority over or some other sufficient
> relationship to that residence.
>
> Even if the person who gave the officer consent did
> not actually have the authority to grant such consent,

the officer may still enter without violating the Fourth Amendment if he reasonably (even though mistakenly) <u>believed</u> that that person had the authority to grant consent.  For example, an officer does not violate the Fourth Amendment if he obtains consent from someone whom he reasonably believes is a resident but who actually is not a resident.

Consent need not be expressed verbally.  It can, for example, be implied by the circumstances, or from a person's words, gestures or conduct.  The question is whether the typical, reasonable person would have understood the exchange between the officer and the resident as implying consent.  For example, even though a resident of a house actually was <u>not</u> giving his consent to police officers, a police officer may have reasonably believed that the resident <u>was</u> giving his consent (through his words, gestures, conduct, and so forth).  Consent once given may be revoked at any time.

Therefore, if you find that any person who lived at the plaintiffs' residence, or any person who possessed common authority over or some other sufficient relationship to that residence, gave the defendant officers consent to enter the plaintiffs' residence on May 13, 2014, then you should find for the defendants. Or if you find that a person who actually did not have the authority to grant such consent, but whom the defendant officers reasonably believed had such authority, consented to the defendant officers entering the plaintiffs' residence on May 13, 2014, then you should find for the defendants.

"Consent" Jury Inst. (emphasis in original).

The plaintiffs requested and it was agreed to add the following sentence in the above jury instruction: "Consent once given may be revoked at any time."  <u>See</u> Pls.' Mot. ¶ 6. Excepting this sentence, the instruction on consent largely matched that proffered by the defendants, with the only other alterations being a single lexical substitution and the omission

4

of defendants' requested reference to the standards relevant to
the doctrine of qualified immunity.  <u>See</u> Defs.' Proposed Supp.
Jury Instruction, ECF No. 69-1.

Plaintiffs now renew their motion for judgment as a
matter of law and assert that they are entitled to such judgment
because "[t]here is no legal theory upon which the jury could
have ruled the search constitutional."  Pls.' Mem. Supp. Mot. at
2 ("Pls.' Mem.").  Specifically, plaintiffs contend that "[a]ll
witnesses at trial who were present at the incident agreed in
their testimony that Sara Carpenter demanded a search warrant
multiple times and that she was upset at the officers' presence
in her home," which, according to the plaintiffs, proves the
officers lacked consent to search the residence.  <u>Id.</u>

## II.   <u>Governing Standard</u>

Federal Rule of Civil Procedure 50(b) provides:

If the court does not grant a motion for judgment
as a matter of law made under Rule 50(a), the
court is considered to have submitted the action
to the jury subject to the court's later deciding
the legal questions raised by the motion.  No
later than 28 days after the entry of judgment --
or if the motion addresses a jury issue not
decided by a verdict, no later than 28 days after
the jury was discharged -- the movant may file a
renewed motion for judgment as a matter of law
and may include an alternative or joint request

> for a new trial under Rule 59.  In ruling on the
> renewed motion, the court may:
>
> (1) allow judgment on the verdict, if the jury
> returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of
> law.

Fed. R. Civ. P. 50(b).

"Judgment as a matter of law is proper when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment[.]" <u>U.S. ex rel. DRC, Inc. v. Custer Battles, LLC</u>, 562 F.3d 295, 305 (4th Cir. 2009) (quoting <u>Chaudhry v. Gallerizzo</u>, 174 F.3d 394, 405 (4th Cir. 1999)).

"Because federal courts do not directly review jury verdicts, constrained, as [they] are, by the Seventh Amendment, the [proponent of a Rule 50 motion] bears a hefty burden in establishing that the evidence is not sufficient to support the [jury's verdict]." <u>Price v. City of Charlotte</u>, 93 F.3d 1241, 1249 (4th Cir. 1996).  A court "may not substitute [its] judgment for that of the jury or make credibility determinations" but must "accord the utmost respect to jury verdicts and tread gingerly in reviewing them." <u>Id.</u>  If any reasonable jury could have returned a verdict for the prevailing party, then a Rule 50(b) motion should be denied.  See <u>Myrick v.</u>

<u>Prime Ins. Syndicate, Inc.</u>, 395 F.3d 485, 489-90 (4th Cir. 2005) (citing <u>Hofherr v. Dart Indus. Inc.</u>, 853 F.2d 259, 261-62 (4th Cir. 1988)).  "If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied."  <u>Id.</u> at 489-90.

As an alternative to judgment as a matter of law, a new trial may be granted under Fed. R. Civ. P. 59 if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." <u>Minter v. Wells Fargo Bank, N.A.</u>, 762 F.3d 339, 346 (4th Cir. 2014) (quoting <u>Knussman v. Maryland</u>, 272 F.3d 625, 639 (4th Cir. 2001)).

### III. <u>Discussion</u>

#### a. Plaintiffs' renewed motion under Rule 50

The plaintiffs' motion is chiefly concerned with the issue of whether the defendant officers had proper consent to enter and search the home.  <u>See</u> <u>generally</u> Pls.' Mot.

A warrantless search is reasonable under the Fourth Amendment if it is conducted pursuant to an occupant's consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (citing Davis v. United States, 328 U.S. 582, 593-94 (1946)).  Consent must be "freely and voluntarily given" and it may be revoked prior to the completion of a search.  United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en banc); Bumper v. North Carolina, 391 U.S. 543, 548 (1968).  "Whether [a party] knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of consent . . . ." Lattimore, 87 F.3d at 650; see also Schneckloth, 412 U.S. at 248-49.  "It is well established that there can be no effective consent to a search . . . if that consent follows a law enforcement officer's assertion of an independent right to engage in such conduct."  Orhorhaghe v. I.N.S., 38 F.3d 488, 500 (9th Cir. 1994) (cited with approval by Lattimore, 87 F.3d at 652); see also Bumper, 391 U.S. at 548-49 (voluntary consent requires "more than acquiescence to a claim of lawful authority").

Consent to search may be given by a "third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."  United States v. Matlock, 415 U.S. 164, 171 (1974).  If officers reasonably believe at the time of their entry that the third

party possesses the authority to consent, there is no Fourth
Amendment violation.  Illinois v. Rodriguez, 497 U.S. 177, 186
(1990).  However, "a physically present inhabitant's express
refusal of consent to a police search is dispositive as to him,
regardless of the consent of a fellow occupant."  Georgia v.
Randolph, 547 U.S. 103, 122-23 (2006).  When a party "with self-
interest in objecting is in fact at the door and objects, the
co-tenant's permission does not suffice for a reasonable
search," however, if the potential objector is "nearby but not
invited to take part in the threshold colloquy, [she] loses
out."  Id. at 121.  An objecting co-tenant may register her
objection through words or expressive conduct.  Bonivert v. City
of Clarkston, 883 F.3d 865, 875 (9th Cir. 2018); see also United
States v. Williams, 574 F. Supp. 2d 530, 545 n.11 (W.D. Pa.
2008), aff'd, 416 F. App'x 130 (3d Cir. 2011) (objection may be
implied); United States v. Phillips, No. 18-cr-102, 2018 WL
4046500, at *3 n.2 (N.D. Okla. Aug. 24, 2018) (same); Waiters v.
Stoddard, No. 1:12-cv-496, 2013 WL 12322080, at *3 n.4 (N.D. Ga.
Aug. 15, 2013) (same).

        On the night of the incident at issue, both Trooper
Minor and Trooper Powers entered the Carpenter home.  Tr.
Proceedings Direct Examination Minor ("Direct Minor"), ECF No.
97 at 17.  Trooper Minor testified that he was the one who made

the first contact with anyone in the Carpenter home.  Direct

Minor at 13, 15-16; Tr. Proceedings Cross-Examination Minor

("Cross Minor"), ECF No. 93 at 24-26.  At the time Trooper Minor

made contact, Trooper Powers testified that he was not at the

door with Trooper Minor when he first entered, but instead "was

at the corner of the garage."  Tr. Proceedings Cross-Examination

Powers ("Cross Powers"), ECF No. 93 at 5.  Trooper Minor knocked

on the door and was met by Pierce Carpenter, Mr. Carpenter's

adult son from a previous relationship.  Direct Minor at 15-16;

Cross Minor at 26; see Mem. Op. Order, ECF No. 61 at 7.  Trooper

Minor testified that the interaction proceeded as follows:

> Q. Isn't it correct that when the door was
> opened, that you stepped in the door prior to
> saying anything?
> A. No, sir, that's not correct.
> Q. So what is your testimony?  You state that you
> asked him a question?
> A. I -- the adult male answers the door.  I
> greeted him by name, to my thought. "Hey, Scott,
> how are you tonight?"  Because Scott Carpenter is
> the gentleman that I'm looking for.  The
> gentleman responds kind of just a "Hi," like kind
> of in shock after -- an afterthought.  But I
> didn't really understand at the time it was just
> -- just maybe shock that we come over and knocked
> on his door.  I don't know.  I don't know what
> the deal with that was.  But he seemed a
> little bit, like, maybe taken off.  And so I
> said, "Hey, Scott, we're here to do a sex
> offender verification.  Buddy, it's dark, it's
> raining.  Do you mind if we come inside?"  He
> steps out of the way, motions, and we come
> inside.
> Q. Why would you call him Scott when his name is
> Robert?

> A. Because right there on the registry sheet, he
> goes by Scott.
> Q. So you didn't say, "Are you Robert Carpenter"?
> A. No, sir.  You know, you get more with sugar
> than you do with spice, and sometimes you just
> want to try to keep things light, if possible.
> Q. And so during this conversation, you walk
> inside?
> A. After he gestured us and allowed us in.
> Q. So he says --
> A. At least, allowed me in.  I'm focused on
> what's in front of me.  I can't tell you when
> Trooper Powers exactly walked in.
> . . . .
> Q. Pierce Carpenter never expressly consented to
> you being in his house, did he?
> A. Yes, sir, the express consent in the obvious -
> - more than obvious implied consent of opening
> the door, gesturing -- upon my inquiry to come
> inside, you know, gestured for me to come inside.
> Q. In fact, he was confused, as per your own
> testimony, correct?
> A. He may have been confused, but he gestured me
> to allow me in the house.

Direct Minor at 16-17, 21; <u>see</u> Cross Minor at 26.


Almost immediately after Trooper Minor entered, Sara

Carpenter came to the door, according to Trooper Powers:

> Q. So Trooper Minor knocked on the door.  Did he
> say anything when he knocked or did he just
> knock?
> A. I can remember the first thing that I heard
> after Trooper Minor knocked on the door was Sara
> Carpenter yelling and screaming.
> Q. This is before the door was answered?
> A. No. The door was already open.  Like, when I
> came around, I heard her just yelling and
> carrying on.  And he was already inside the door.

Tr. Proceedings Direct Examination Powers ("Direct Powers"), ECF

No. 96 at 7.   Trooper Minor testified that when he first entered

the door:

> A. There was some confusion.  Once he allowed us
> in, I think I started trying to ask him things.
> And there was some confusion, and he yells,
> "Sara," -- yells for her to come down the hall.
> Q. So, as far as you -- as far as you can tell at
> the time, the younger adult male, the younger
> male who answered the door appeared to be
> confused, right?
> A. Once we got in.  Once you start, you know,
> evaluating your situation, we realized that there
> is maybe some confusion here.
> Q. Okay.  And then at some point in the confusion
> that ensued, he informed you -- if you couldn't
> already tell that he was an 18-year-old -- that
> he wasn't the 50-year-old sex offender that you
> were looking for, right?
> A. I don't even know if we kept talking with him
> or if it's when Sara came down the hall that she
> was the one that said so.
> Q. So Sara Carpenter saw what was going on pretty
> quickly; is that fair?
> A. Generally.
> Q. Okay.  And then she came up and then she saw
> state troopers in her house, right?
> A. Yes.

Direct Minor at 17-18.

> Upon seeing Trooper Minor in her entry, Sara Carpenter

began pointedly inquiring about a warrant:

> Q. And she asked for a warrant?
> A. She wanted to know why we were there and asked
> immediately about, "Do you have a warrant?"
> . . . .
> "Do you need a warrant?  Do you have a warrant?
> Can I have a copy of the warrant?"

> It was explained that we were not there for a
> search, there was no warrant; we are here for a
> sex offender verification.  She was continuing to
> be irritable.  She was on a rant.
> . . . .
> Q. So she asked you for a warrant, and you told
> her that, no, you did not have a warrant because
> you didn't need a warrant, in your opinion; is
> that right?
> A. Correct, sir.

Direct Minor at 18-19.

> Trooper Powers further testified:

> Q. So what was the first thing that you saw?
> A. When we went inside, Sara Carpenter was just
> belligerent, yelling.  We were trying to explain
> to her we're just there doing sex offender
> verification; there is no need to get upset, out
> of hand.  We're just trying to talk to Scott and
> make sure everything is normal on the register
> that he just came in and registered, and we're
> verifying that.  And we kept trying to explain
> that, but she didn't want to listen.  She just
> kept yelling at us.
> Q. And this was in the kitchen?
> A. No, this was as soon as we went through -- the
> breezeway, from what I remember[.]

Direct Powers at 8-9.

Although the record does not indicate that Sara
Carpenter ever specifically demanded that the Troopers leave the
home, she made her objection to their entry apparent.  Direct
Minor at 19.  When questioned whether "it was clear to [him]
that she didn't want [him] to be there," Trooper Minor
testified, "Sure, absolutely."  Id. at 19.  When asked a similar
question, Trooper Powers testified:

Q. . . . Sara Carpenter was making it clear that she didn't want you there?

A. No, she never said she didn't want us there. She was mad that we were there doing a sex offender verification.

Q. Isn't that the same thing?

A. I'm sorry, sir.

Q. Did you ask her if she -- if you could come in?

A. Well, we were standing inside the house, and she never told us to get out or leave, by any means.

Q. Well, she asked you for a warrant, didn't she?

A. She asked multiple times for a search warrant. She wanted a copy of the search warrant.  And we kept trying to explain to her, we're doing a sex offender verification, and we don't provide a search warrant when we do a sex offender verification; that's not something we ever do.

Q. So you admit that you did not have a warrant when you entered the Carpenter home on May 13, 2014?

A. Yes, we didn't have a warrant.  We were inside the house and she didn't have a problem with it.

Q. Well, apparently, you testified that she did have a problem?

A. She was upset and angry, yes, sir.

Q. She was asking if you had a warrant?

A. Correct.

Q. She was asking to see the warrant?

A. Yes, sir.

Q. And your response was that you didn't have a warrant?

A. Correct.  We did not.

Q. So you never asked consent to enter the Carpenter home, did you?

A. No, sir.

Direct Powers at 9-10.

The record developed at trial demonstrates that the officers could have reasonably believed that Pierce Carpenter

14

provided them with consent to enter and search the home;
however, Sara Carpenter was quickly present, and a reasonable
juror could conclude that her actions amounted to an objection
to the Troopers' entry and search.  Sara Carpenter persistently
inquired about a warrant, appeared angry and upset at the
presence of the Troopers in her home, and was belligerent and
yelling.  <u>See</u>, <u>e.g.</u>, Direct Powers at 8-10.  She remained
adamant in her conviction that the Troopers should have a
warrant to search her home, even as the Troopers informed her
that no warrant was necessary under their apparent, if
erroneous, belief that they had the right to be in the home to
conduct the verification, which necessarily involved a search,
at least for the limited purposes of an annual sex offender
verification.  <u>See</u>, <u>e.g.</u>, Cross Minor at 6-7 (Minor: "We
explained to her that we're just there for the sex offender
verification.  We're not here to search your residence; we're
here for a sex offender verification.  You know . . . that we
didn't need the warrant to go through to search her residence;
we weren't there to search her residence."); Direct Powers at 13
(Powers: "She kept saying we should have a search warrant.  And
we kept explaining to her that we are doing a sex offender
verification.").

While the record indicates that Trooper Minor encountered Pierce Carpenter first, Sarah Carpenter quickly joined Pierce at or near the front door, and her vocal dissatisfaction was immediately apparent just after Minor stepped through the door.  <u>See</u> Direct Powers at 7; Direct Minor at 17-18.  <u>Randolph</u> draws a fine line: "if a [person] with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not part of the threshold colloquy, loses out."  547 U.S. at 121.  Although Sara Carpenter was not at the door when Trooper Minor first approached, appearing momentarily after he crossed the threshold, she was sufficiently expedient as to make her objection contemporaneous.

This accords with the Supreme Court's discussion in <u>Randolph</u> wherein the Court spoke at length about the social customs of entering a home.  There, the Court reasoned that:

> [A] caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.' Without some very good reason, no sensible person would go inside under those conditions.

<u>Id.</u> at 113.

Extending that reasoning to a member of law enforcement met with the same scenario, the Court in <u>Randolph</u> found that "disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all[,]" as "nothing in social custom or its reflection in private law argues for placing a higher value on delving into private premises to search for evidence in the face of disputed consent, than on requiring clear justification before the government searches private living quarters over a resident's objection." <u>Id.</u> at 114, 120.

Like Trooper Minor, <u>see</u> Direct Minor at 19, a reasonable juror could conclude that Sara's vigorous demands for a warrant and expressive conduct toward the officers amounted to an objection to their continued presence in her home, <u>see</u> <u>Bonivert</u>, 883 F.3d at 875, constituting "an express refusal to permit entry" as stated in <u>Randolph</u>, thereby revoking any consent procured from Pierce as a co-tenant in the home. Nevertheless, there is also sufficient evidence to support a reasonable juror's finding in defendants' favor. Namely, Trooper Powers testified that he did not understand Sara to be asking the troopers to leave. <u>See</u> Direct Powers at 9-10. In light of the factual nature of the issue of co-tenant consent

revocation as applied here, the question is one appropriately left to a jury equipped with an adequate consent instruction, making judgment as a matter of law inappropriate.


   b. Plaintiffs' alternative motion under Rule 59

        The plaintiffs seek relief under Rule 59(b) under two theories.  First, they argue, the jury verdict was against the weight of the evidence, and second, the trial amounted to a miscarriage of justice due to either the plaintiffs' claim of unfair surprise at defendants' theory of consent, which plaintiffs' counsel asserts was raised for the first time on the eve of trial, or certain statements made by defense counsel during closing arguments.  The court supplements the analysis by considering whether a new trial is warranted on the basis of the court's instruction to the jury on the law of consent.


   1. Weight of the evidence

        "[W]hen considering whether to grant a new trial under Rule 59, a trial judge may weigh the evidence and consider the credibility of the witnesses."  <u>Wall Guy, Inc. v. Fed. Deposit Ins. Co.</u>, - F. Supp. 3d -, No. 3:20-cv-304, 2023 WL 1806820 at

*6 (S.D. W. Va. Feb 7, 2023) (quoting <u>Poynter by Poynter v.</u>
<u>Ratcliff</u>, 874 F.2d 219, 223 (4th Cir. 1989)).  Weight of the
evidence challenges on a motion for new trial require the
district court "to engage in a 'comparison of proofs.'"  <u>Econo</u>
<u>Lodges of America, Inc. v. Norcross Econo-Lodge, Ltd.</u>, 764 F.
Supp. 396, 402 (W.D.N.C. 1991) (citing <u>Ellis v. Int'l Playtex,</u>
<u>Inc.</u>, 745 F.2d 292, 298 (4th Cir. 1984)).  "[A] trial court
should exercise its discretion to award a new trial sparingly,
and a jury verdict is not to be overturned except in the rare
circumstance when the evidence weighs heavily against it."
<u>Fussman v. Novartis Pharms. Corp.</u>, 509 F. App'x 215, 218 (4th
Cir. 2013) (quoting <u>United States v. Smith</u>, 451 F.3d 209, 216-17
(4th Cir. 2006)).

     The plaintiffs do not separately articulate the
factual basis for their challenge to the sufficiency of the
evidence as it pertains to their alternative motion for a new
trial.  The court relies on its foregoing analysis of the
plaintiffs' Rule 50(b) motion and concludes that, even under the
more forgiving standard of Rule 59, <u>see</u> <u>Cline v. Wal-Mart</u>
<u>Stores, Inc.</u>, 144 F.3d 294, 301 (4th Cir. 1998), the proof
adduced at trial could lead a jury to issue the same verdict in
favor of the defendants.  While the court might generally view
the weight of evidence as tending to show that Sara Carpenter

revoked any consent to search given by Pierce, in view of the testimony of both Trooper Minor, see Direct Minor at 19, and uncontested protestations of Sara Carpenter, the contrary testimony of Trooper Powers, who maintained that she never asked the troopers to leave, could have been viewed as more persuasive by a reasonable jury.  See Direct Powers at 9-10.  The court does not find that this creates the "rare circumstance" where the weight of the evidence is so clearly contradictory to the verdict that it, standing alone, warrants a new trial.  See Fussman, 509 F. App'x at 218.  In any event, the court finds that the plaintiffs' alleged infirmities at trial are better suited to analysis as having possibly effectuated a miscarriage of justice than as being against the weight of the evidence.

### 2. Miscarriage of justice

#### i. Unfair surprise

"[S]urprise does not warrant a new trial unless it deprives the party of a fair hearing." Twigg v. Norton Co., 894 F.2d 672, 675 (4th Cir. 1990) (citing Brady v. Chem. Constr. Corp., 740 F.2d 195 (2d Cir. 1984)).  "The movant must prove he was reasonably and genuinely surprised," Gilreath v. Cumberland Cnty. Bd. of Educ., 304 F.R.D. 481, 486 (E.D.N.C. 2015), and

that his surprise was necessarily inconsistent with substantial justice and resulted in actual prejudice.  <u>Twigg</u>, 894 F.2d at 675.  Thus, a party may succeed on a motion for new trial on the basis of unfair surprise by proving its surprise was: (1) reasonable, (2) genuine, (3) inconsistent with substantial justice, and (4) actually prejudicial.  <u>See</u> <u>id.</u>

Plaintiffs' unfair surprise argument rests on plaintiffs' claim that defendants raised the defense of consent for the first time on the eve of trial.  <u>See</u> Pls.' Mem. at 5-6. Plaintiffs note that defendants did not raise the defense of consent in their memorandum in support of summary judgment; in the parties' integrated pretrial order; or in defendants' original, timely-filed jury instructions.  <u>Id.</u>  Rather, plaintiffs say, defendants asserted the defense of consent for the first time the day before trial when they submitted a Proposed Supplemental Jury Instruction (ECF No. 69) on the law of consent.  Plaintiffs' counsel concedes that he was unprepared for the consent issue at trial.  Pls.' Reply, ECF No. 95 at 8.

Defendants rebut the plaintiffs' unfair surprise arguments by pointing out that plaintiffs' complaint raised the issue of consent, the defendants raised the issue of consent in their depositions of the plaintiffs, and the court's summary judgment order identified the issue of consent as being an

outstanding disputed question of material fact.  Defs.' Resp.,
ECF No. 90 at 17-18.  Further, they counter that any surprise
was of the plaintiffs' own making due to their failure to depose
any of the defendants in preparation for trial.  Id. at 17.
Finally, they point to plaintiffs' failure to object to or rebut
the defendants' presentation of evidence as to consent at trial,
as well as plaintiffs' failure to object to the jury instruction
on consent.  Id.

        Plaintiffs' motion for new trial based on unfair
surprise fails at the first step of the court's inquiry because
it is fundamentally unreasonable.  It is well understood that an
officer's search of the home may pass constitutional muster when
there is a warrant, exigent circumstance, consent, or another
exception to the warrant requirement.  It is simply unreasonable
to expect that, in a Section 1983 case regarding a putatively
unconstitutional search and after conducting no depositions of
the subject defendants, the defense of consent would be
categorically inapplicable.  This is especially the case where
the plaintiffs' own complaint specifically pled facts addressed
to the issue of consent.  See Compl., ECF No. 1 at 7, 11.

        Furthermore, even if plaintiffs' surprise at the late
introduction of the defendants' consent theory were reasonable,
it does not amount to genuine surprise warranting a new trial.

Not only were plaintiffs aware of this new theory in advance of trial, but they also proposed a supplemental jury instruction addressing the law of consent, see ECF No. 71, and made a closing argument to the jury that contrapuntally attacked the defendants' theory of consent.

The time for framing plaintiffs' arguments on consent may have been compressed, but it cannot be said to have risen to the level of genuine surprise when plaintiffs were aware of the new defense theory before trial and made substantial arguments on it at trial.  See Watkins v. Casiano, 413 F. App'x 568, 569 (4th Cir. 2011) (per curiam) (affirming denial of new trial on basis of unfair surprise where purported new theory of defense raised on first day of trial).  This is especially so where the plaintiffs did not object to the new defense theory when they were put on notice of it by virtue of the supplemental jury instructions nor did they seek a continuance from the court so as to adequately prepare themselves for trial on that legal theory.

Having concluded that the plaintiffs' asserted surprise at the defendants' pursuit of the consent theory on the eve of trial was neither reasonable nor sufficiently acute to constitute genuine surprise, a new trial on this ground is not merited.

### ii. Error in closing argument

"In general, failure to object to a closing argument waives the right to attack the verdict on a motion for a new trial[.]" Ray v. Allergan, Inc., 863 F. Supp. 2d 552, 565 (E.D. Va. 2012) (Payne, J.) (citing Doe ex rel. G.S. v. Johnson, 52 F.3d 1448, 1465 (7th Cir. 1995)). "It is the universal rule that during closing argument counsel cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial." Dennis v. Gen. Elec. Corp., 762 F.2d 365, 366-67 (4th Cir. 1985) (internal citations omitted). "A motion for a new trial should not be granted, therefore, where the moving party has failed to timely object to the alleged impropriety giving rise to the motion." Id. at 367. Failure to timely object "will be overlooked . . . only if exceptional circumstances exist[.]" Id.

The plaintiffs contend that two statements of defense counsel during closing arguments confused and prejudiced the jury, warranting a new trial. First, the plaintiffs argue that the jury verdict was obtained by defendants' appeal to purported jury sympathies toward police officers and repeated reference to Robert Carpenter as a sex offender, though plaintiffs do not

number them.[1]  Pls.' Mem. at 14-15.  They particularly contest defense counsel's reference to Trooper Minor as "a former Marine that got the Purple Heart, that got a Medal of Honor, and . . . some type of Marine of the Year . . . . That's the kind of guy we're dealing with here."  Tr. Proceedings Closing Args. ("Closing Args."), ECF No. 87 at 24-25.  Plaintiffs contend there was no evidence presented that Trooper Minor was in fact a Medal of Honor recipient and that the assertion unfairly biased the jury.  Pls.' Mem. at 15.  Defendants contend that the court reporter erroneously transcribed "a medal of honor" as "a Medal of Honor;" that counsel's other statements to the jury indicated this was in fact a Medal of Valor, which is a type of honorary medal; and that Trooper Minor had, in fact, received such a medal.  Defs.' Resp. at 21.  Because plaintiffs failed to object at trial and any error on these accounts is harmless, the court is not empowered to grant a new trial on this basis.  See Fed. R. Civ. P. 61.

Second, the plaintiffs contend that the jury was misled and confused by a statement of defense counsel during closing arguments that amounted to a material misstatement of the law of consent.  Pls.' Mem. at 6, 17; Pls.' Reply at 6-7.

---

[1] During closing argument, counsel for defendants used the term sex offender 27 times in his remarks to the jury.  See Closing Args. at 18-35.

Specifically, the plaintiffs point to defense counsel's statement to the jury that:

> Mr. Carpenter is the one that gave the consent to continue the verification process. He's the only person that could revoke that consent.
>
> [Plaintiffs' counsel] wants you to believe that Sara Carpenter could revoke Scott Carpenter's consent. But Scott Carpenter gave the consent.

Closing Args. at 26.

Defendants respond that this is a correct statement of law in that Fourth Amendment rights are personal in nature. Defs.' Resp. at 10. In essence, they contend that Pierce Carpenter's consent was good as to all occupants and that Scott Carpenter renewed that consent. Id. at 9-15. They argue that consent was not revoked because Sara was not contemporaneously present at the time either consent was given and that, in any event, any revocation of consent was individual to Sara and did not make the search unreasonable as to Scott in light of limiting language in the holding of Randolph that a co-tenant's objection makes a search unreasonable "as to him." Id.

As the court's foregoing discussion of the doctrine of co-tenant consent revocation makes clear, defendants' application of Randolph to the present facts is not persuasive. Sara's near immediate appearance at the door and vociferous, pointed inquiries of the officers' basis for the search closely

approximate the threshold colloquy envisioned by Randolph, and a reasonable juror could conclude that her pitched demands for a warrant and clearly expressive behavior amounted to an express refusal to permit entry, just as a reasonable juror could have concluded it fell short of that mark.  Furthermore, there is no discernible doctrinal basis for the implied requirement in defendants' theory that would force Sara, if deemed to have revoked the consent to search procured from Pierce by her protest at the door, to follow the officers around her own home as they conducted a warrantless search and continue to voice her objections lest the officers find another occupant from whom to procure consent.  That Sara was not present and objecting when the officers obtained putative consent from Scott is of no moment.  See Orhorhaghe, 38 F.3d at 500.

Defense counsel's statement at closing argument thus represents an incomplete and misleading statement of the law of consent at least insofar as it suggests that the objections of Sara, a plaintiff in the case, were irrelevant to the issue of consent.  The ultimate question is whether this presents an adequate basis for a new trial where the plaintiffs made no objection at trial.

The court notes that while plaintiffs' counsel did not object to defense counsel's statement at trial, his arguments in

rebuttal identified for the jury that defense counsel's
statement of law was incomplete and directed them to follow the
instructions from the court.  <u>See</u> Closing Args. at 43 ("I don't
think you'll see anywhere in the instructions where it says only
Scott Carpenter can revoke consent.").  Plaintiffs' counsel thus
mitigated the confusing or misleading effect of defense
counsel's statement in closing argument and any error from the
statement itself was harmless.  <u>See</u> <u>United States v. Cone</u>, 714
F.3d 197, 230 (4th Cir. 2013) (Wynn, J., concurring in part)
(citing <u>Chalmers v. Mitchell</u>, 73 F.3d 1262, 1271 (2d Cir. 1996).

### iii. Jury instruction

"A court may consider a plain error in the
instructions [to the jury] that has not been preserved . . . if
the error affects substantial rights."  Fed. R. Civ. P.
51(d)(2).  Plain error review of a jury instruction requires
that "(1) the district court erred; (2) the error is plain; (3)
the error affects substantial rights; and (4) the error
seriously affects the fairness, integrity or public reputation
of judicial proceedings."  <u>United States ex rel. Oberg v.</u>
<u>Pennsylvania Higher Educ. Assistance Agency</u>, 912 F.3d 731, 738
(4th Cir. 2019) (internal marks omitted).  An error is plain
when it is "clear or obvious, rather than subject to reasonable

dispute[.]" <u>United States v. Marcus</u>, 560 U.S. 258, 262 (2010).
In the ordinary case, an error affects substantial rights where
it was prejudicial, meaning that there is a reasonable
probability it affected the outcome of the trial.  <u>Id.</u> (citing
<u>United States v. Olano</u>, 507 U.S. 725, 734-35 (1993)).

     The test for adequacy of jury instructions "is not one
of technical accuracy in every detail[,]" but "simply the
practical one of whether the instructions construed as a whole,
and in light of the whole record, adequately informed the jury
of the controlling legal principles without misleading or
confusing the jury to the prejudice of the objecting party."
<u>Spell v. McDaniel</u>, 824 F.2d 1380, 1395 (4th Cir. 1987).

     Here, the jury found that plaintiffs had not
demonstrated "that a Defendant, or Defendants, violated Sara and
Robert Carpenter's Fourth Amendment right to be free from an
unreasonable search and seizure of their home."  Jury Verdict
ECF No. 81.  However, the court's instruction on the law of
consent did not adequately reflect the law as stated in
<u>Randolph</u>, though both parties assisted in the formulation of
that instruction and no party made any objection to its content.
The jury was instructed that they "should find for the
defendants" if they "find that any person who lived at the
plaintiffs' residence, or any person who possessed common

authority over or some other sufficient relationship to that
residence, gave the defendant officers consent to enter the
plaintiffs' residence on May 13, 2014," or if they "find that a
person who actually did not have the authority to grant such
consent, but whom the defendant officers reasonably believed had
such authority, consented to the defendant officers entering the
plaintiffs' residence on May 13, 2014," and that "[c]onsent once
given may be revoked at any time."  "Consent" Jury Inst.

     The verdict rendered by the jury complied with this
instruction, but the instruction itself did not "adequately
inform[] the jury of the controlling legal principles," and
likely "misle[d] . . . the jury to the prejudice of the
[plaintiffs]."  Spell, 824 F.2d at 1395.  A proper instruction
would have instructed the jury on the law governing three
questions of fact within the province of the jury that were left
unaddressed by the court's consent jury instruction.

     First, the jury should have been appropriately
instructed so as to enable them to consider whether Sara
Carpenter's express statements were an effective objection to
any consent to a search of her home.  See Randolph, 547 U.S. at
122-23.  In light of the record, a reasonable jury could find
that Sara Carpenter's statements to the troopers, including her
repeated exhortations and demands for a warrant, amounted to an

express refusal to permit entry and conduct a search.

Second, the jury should have been appropriately instructed so as to enable them to consider whether Sara Carpenter's expressive conduct amounted to an express refusal of consent. Even if a jury finds that she did not object to the troopers' presence by her words, she may still object by demonstrable expressive conduct manifesting her desire to refuse consent to search. See Bonivert, 883 F.3d at 875. In light of the conflicting testimony of Trooper Minor, see Direct Minor at 19, and Trooper Powers, see Direct Powers at 9-10, a question of fact exists as to whether Sara's expressive conduct made clear to the troopers that she was objecting to their presence in her home.

Third, the jury should have been instructed on the alternative possibility that any consent procured from Pierce or any failure on the part of Sara to expressly refuse entry was ineffective in light of the troopers' mistaken assertions of lawful authority to conduct a sex offender verification. See Orhorhaghe, 38 F.3d at 500; Lattimore, 87 F.3d at 652. In light of the troopers' repeated assertions that their warrantless presence in the home was authorized as a sex offender verification, see, e.g., Direct Minor 18-19; Direct Powers 9-10, a reasonable juror could conclude that this formed the basis for

31

any consent procured from Pierce, rendering it ineffective, or any failure on the part of Sara to expressly refuse entry.

Though the plaintiffs by their counsel assented to it, the consent jury instruction as given at trial did not properly instruct the jury on the law governing the foregoing facts. Accordingly, the court finds that the consent jury instruction as given amounts to plain error because: (1) it was error to instruct the jury on the law of consent without an instruction as to the relevant rules of co-tenant consent revocation under Randolph/Bonivert and effective consent under Orhorhaghe/Lattimore; (2) these omissions are plain; (3) the error affected the plaintiffs' substantial rights insofar as there is a reasonable probability that the incomplete instruction on the law of consent prejudiced the plaintiffs, as evidenced by the jury's adverse verdict; and (4) an error in stating the law within a pivotal jury instruction has a serious effect on the fairness and integrity of judicial proceedings. In view of the plain error in the jury instruction on the law of consent, the court observes that there is a sufficient basis to warrant a new trial.

c. The court's authority under Rule 59(d)

Having determined that a new trial is warranted, the court must consider its authority to order it.  Notably, the plaintiffs' combined motion did not seek relief on the basis of the court's incomplete jury instruction on the law of consent. Nevertheless, "the trial judge must be allowed wide discretion in granting a new trial." Ford Motor Credit Co. v. Minges, 473 F.2d 918, 923 (4th Cir. 1973) (citing Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 216 (1947)).  In ruling on a motion for new trial, a "[c]ourt enjoys a greater degree of discretion than when ruling on a motion for a directed verdict." Crown Central Petroleum Corp. v. Brice, 427 F. Supp. 638, 642 (E.D. Va. 1977).

Rule 59(d) provides that "[a]fter giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion" of a party that is timely filed.  Fed. R. Civ. P. 59(d), second sentence; Wright & Miller, 11 Federal Practice and Procedure § 2813 (3d ed. 2022); see also United States v. Rafiekian, 991 F.3d 529, 551 (4th Cir. 2021) (noting, in dicta, court's authority under Rule 59(d) to grant new trial in civil cases for reasons not stated in a litigant's motion for new trial).  Accordingly, the court's authority to grant a new trial

in such instances has three conditions: (1) timing, (2) notice, and (3) specification of reasons.

A court acting under the authority of Rule 59(d) may grant a new trial either before or after the entry of judgment. See Douglas v. Union Carbide Corp., 311 F.2d 182, 184 (4th Cir. 1962) (similarly worded timing requirement under Rule 59(b) "was designed to be broad enough to permit the motion to be made both before and after the entry of judgment"). When judgment has been entered, parties have 28 days to file motions for a new trial under Rule 59(b) and a court acting sua sponte has 28 days to enter an order granting a new trial under Rule 59(d). Fed. R. Civ. P. 59. Rule 59(d)'s 28-day time limit "does not apply to a decision based on a reason not stated in a timely filed Rule 59(b) motion." Kelly v. Moore, 376 F.3d 481, 484 (5th Cir. 2004); Wright & Miller, 11 Federal Practice and Procedure § 2813 (3d ed. 2022). The timeliness of a motion filed under Rule 59 is assessed by reference to the date a judgment order is entered by the Clerk. Sawyer v. Atl. Disc. Corp., 442 F.2d 349, 350–51 (4th Cir. 1971). This requirement looks to when and whether judgments upon a jury verdict were actually entered by the clerk, notwithstanding the requirements of Rule 58. See Douglas, 311 F.2d at 184 (upholding new trial granted 23 months after jury verdict returned where judgment not yet entered).

Here, the timing requirement of Rule 59(d) is inapplicable notwithstanding the length of time that has elapsed since the jury returned its verdict at trial on December 7, 2017, because judgment has not been entered and thus the clock has not yet begun to run under Rule 59.[2]

"Although a district court may grant a new trial on its own initiative for reasons not stated in a timely post-trial motion, the court is directed to give the parties notice and an opportunity to be heard on the matter." Valtrol, Inc. v. Gen. Connectors Corp., 884 F.2d 149, 155–56 (4th Cir. 1989) (internal marks omitted); accord Central Microfilm Serv. Corp. v. Basic/Four Corp., 688 F.2d 1206, 1211 (8th Cir. 1982).  The Fourth Circuit has noted that Rule 59(d)'s "notice requirement may not be ironclad, but the rule clearly contemplates notice in the ordinary case." Valtrol, 884 F.2d at 156.

Accordingly, the court may order a new trial due to the incomplete jury instruction on consent.  By this memorandum

---

[2] Even if judgment had been entered, the court would still not be impeded by the timing requirement of Rule 59 because the plaintiffs' motion was timely filed on December 13, 2017, a mere six days after the verdict was returned.  Where a district court grants a new trial for reasons other than those raised by a party in its timely-filed motion, it is deemed to act of its own authority under Rule 59(d), but the timeliness requirement is satisfied so long as the party's motion for a new trial was timely filed under Rule 59(b).  See Central Microfilm, 688 F.2d at 1211.

opinion, the court provides the parties with notice of its proposed ground for a new trial.  The parties may respond to the court's proposal by submission of supplemental briefing.


## IV. Conclusion

The court withholds judgment upon the plaintiffs' alternative motion for a new trial pursuant to Rule 59 until such time as the parties have had an opportunity for submission of any supplemental briefing on the grounds for new trial raised by the court in Section III.b.2.iii pursuant to its authority under Rule 59(d).

Accordingly, it is ORDERED that:

1. The plaintiffs' renewed motion for judgment as a matter of law be, and hereby is, denied;

2. Any responsive papers to the court's proposed ground for a new trial set forth in Section III.b.2.iii be filed by the following dates:

    a. Any response of the plaintiffs is due March 17, 2023;

    b. Any response of the defendants is due March 24, 2023;

    c. Any reply of the plaintiffs is due March 29, 2023.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: March 3, 2023

John T. Copenhaver, Jr.
Senior United States District Judge